
[No. A114692. First Dist., Div. Three. Oct. 26, 2007.]

JPI WESTCOAST CONSTRUCTION, L.P., Plaintiff and Appellant, v.
RJS & ASSOCIATES, INC., Defendant and Respondent;
GREAT AMERICAN INSURANCE COMPANY, Defendant,
Cross-complainant and Respondent;
TRANSCONTINENTAL INSURANCE COMPANY, Cross-defendant and
Appellant.

## COUNSEL

Woolls & Peer, Gregory B. Scher and Jo Ann Montoya for Plaintiff and Appellant and for Cross-defendant and Appellant.

Snell & Wilmer, Kevin S. Taylor, Scott C. Sandberg and Christine M. Garrison for Defendant and Respondent.

Duane Morris, Peter J. Whalen, Robert M. Fineman, Kathryn C. Ashton and Anhthu H. Le for Defendant, Cross-complainant and Respondent.

## OPINION

**HORNER, J.**[*]—

### INTRODUCTION

Appellant JPI Westcoast Construction, L.P. (JPI), the general contractor on a large construction project, hired respondent RJS & Associates, Inc. (RJS),

---

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

as a subcontractor on a phase of the project. The construction contract between JPI and RJS contained an indemnity clause in favor of JPI. During the course of the work undertaken by RJS, a worker was killed in an accident. In the underlying action, the worker's family sued JPI, RJS and others for wrongful death. RJS's insurers assumed defense of the action on behalf of JPI and RJS. A jury found that JPI was 20 percent at fault for the accident and RJS was 70 percent at fault, and awarded judgment in the amount of $6,853,284 in favor of the worker's family. After trial, the family settled with JPI and RJS for a total of $4.9 million.

This appeal arises from the subsequent round of litigation between JPI and its primary insurance carrier, Transcontinental Insurance Company (Transcontinental) and RJS and its excess carrier, Great American Insurance Company (Great American), over contributions to the settlement of the underlying action. On stipulated facts, the trial court ruled in favor of RJS and Great American, and against JPI and Transcontinental, on four separate motions for summary judgment. We shall affirm the trial court's summary judgment rulings for reasons more fully explained below. In doing so, we address an issue involving principles of indemnity and subrogation that may be stated as follows: Assuming JPI's contractual right to indemnity by RJS is triggered under the facts presented here, then does the indemnity clause control the payment obligations of the parties' respective insurers, or are such obligations determined by the language in the applicable policies of insurance?

## FACTS & PROCEDURAL BACKGROUND

A.  *The JPI-RJS Subcontract*

On December 22, 1999, JPI entered into a contract with Jefferson at Bay Meadows, L.P., to serve as general contractor for the construction of the Bay Meadows apartment complex (Project). On January 18, 2000, JPI entered into subcontract No. 76003-03-3001-999 (subcontract) with RJS, by which RJS agreed to build seven complete subterranean concrete podium structures for the contract price of $12,765,958, including all design engineering work.

The subcontract contained the following indemnity clause: "To the fullest extent permitted by law, Subcontractor shall indemnify and hold harmless . . . Contractor and Contractor's agents and employees (the 'Indemnitees') from

all claims, damages, losses and expenses . . . attributable to bodily injury, . . . death or injury . . . arising out of or in connection with the performance of the Work of Subcontractor performed . . . in connection with the Project, by anyone directly or indirectly employed by Subcontractor, or anyone for whose acts Subcontractor is liable even if caused jointly and concurrently by the negligence of the Indemnitees and Subcontractor. . . . The above indemnity provisions *do not extend to, or cover any loss, damage, or expense arising out of the sole negligence or willful misconduct of Contractor*, its employees and agents or any other Indemnitees." (Italics added.)

The subcontract contained the following provision regarding insurance coverage: "Prior to the commencement of the Work and periodically thereafter as required by Contractor, subcontractor shall deliver to Contractor satisfactory certificates evidencing compliance by Subcontractor with the insurance requirements set forth in Section VII of the Project Manual to these General Provisions and incorporated herein for all purposes. All policies, with the exception of Workers compensation, shall name contractor and the Owner as Additional Insured parties on a primary basis. . . . All original insurance certificates are to be sent to JPI. . . . If requested by contractor, Subcontractor shall furnish copies of insurance policies required by the Contract Documents. The requiring of any and all insurance as set forth in these paragraphs, or elsewhere, is in addition to and not in any way in substitution for all the other protection provided under the subcontract to Contractor, including Paragraph 11 (Indemnity)."

B. *The Insurance Policies*

JPI purchased commercial general liability coverage from Transcontinental in the form of policy No. 167039430, issued on December 15, 2000. The Transcontinental policy carried a per-occurrence limit of $1 million. For purposes of summary judgment, JPI and RJS stipulated that the Transcontinental policy covers JPI for the damages arising from the underlying action.

RJS purchased commercial general liability insurance from Underwriters at Lloyds (Lloyds) in the form of policy No. 61899163500150 with an effective date of March 1, 2000, and a policy expiration date of October 1, 2001. The Lloyds policy provided aggregate coverage in the amount of $2 million, with a per-occurrence limit of $1 million. JPI was named as an additional insured

on the Lloyds policy in an endorsement added to the policy. Another endorsement added to the Lloyds policy provided that the Lloyds policy "shall be considered primary and non-contributory to any similar insurance held by third parties in respect of work performed by you [the insured] under written contractual agreement(s) with said third parties."

In addition, RJS was the sole named insured on a commercial umbrella policy that RJS purchased from Agricultural Excess and Surplus (now Great American) with a general aggregate and per occurrence limit of $9 million. The Great American policy had an effective date of April 1, 2000, and an expiry date of October 1, 2001. The Great American umbrella policy contained a schedule of underlying policies listing, among others, the Lloyds policy, but not the Transcontinental policy. In its coverage provisions, the Great American policy states that Great American will pay "on behalf of the 'Insured' those sums *in excess of the 'Retained Limit'* that the 'Insured' becomes legally obligated to pay by reason of liability imposed by law or assumed by the 'Insured' under an 'insured contract' because of 'bodily injury' . . . that takes place during the Policy Period and is caused by an 'occurrence' happening anywhere." (Italics added.) As pertinent here, the Great American policy defines "Retained Limit" as follows: "[T]he greater of: [¶] 1. the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other insurance providing coverage to the 'Insured' during the Policy Period. . . . " For purposes of summary judgment, JPI and RJS stipulated that JPI qualifies as an additional insured under the Great American policy.

The Great American policy also contains an "other insurance" clause, which states: "If other insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. Nothing herein will be construed to make this policy subject to the terms, conditions and limitations of such other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy."

C. *The Underlying Lawsuit*

On September 12, 2001, Luis Sanchez was working as a "hose man" for a concrete pour at the Project when the left front outrigger of a concrete pump truck plunged into the soil above a buried irrigation box. As a result, the

outstretched boom of the truck dropped down and struck Mr. Sanchez, ultimately causing his death. Mr. Sanchez's wife and two minor children filed a wrongful death lawsuit against JPI, RJS, CF&T (operator of the concrete pump truck) and others.

JPI tendered its defense in this action to RJS and Lloyds. Lloyds accepted JPI's defense as an additional insured under the Lloyds policy. During the course of the lawsuit, coverage counsel for Transcontinental (then known as CNA) wrote to Lloyds and Great American on the matter of indemnification. Transcontinental noted that damages would likely exceed the limits of the Lloyds policy and asserted that "[p]ursuant to the terms of the contracts between the parties, RJS, Lloyds and Great American owe an obligation to indemnify JPI for a judgment or settlement up to the combined $10 million policy limit of both the Lloyds and Great American policies prior to the application of the CNA policy." Great American rejected Transcontinental's assertion and replied that all primary coverage, including that provided by Transcontinental, must exhaust before its excess coverage was triggered.

Ultimately, the matter was tried against JPI, RJS and CF&T. The jury returned verdicts against all three defendants on November 16, 2004. Specifically, the jury found all three defendants negligent, apportioning fault 20 percent to JPI, 70 percent to RJS, and 10 percent to CF&T. The jury awarded the plaintiffs economic damages in the amount of $1,853,284.27 and noneconomic damages in the amount of $5 million. After it was reduced by a percentage of previous settlements by other parties, the resulting award to the plaintiffs was $6,839,457.50.

After the jury verdict, RJS and its insurers, Lloyds and Great American, entered into settlement negotiations with the plaintiffs. Great American demanded that Transcontinental participate in the settlement, but Transcontinental refused to contribute any amount to the settlement on behalf of JPI. Nor did JPI contribute any amount to the eventual settlement. Subsequently, RJS, Lloyds and Great American settled with the plaintiffs for $4.9 million pursuant to a settlement agreement and release (settlement agreement) signed by the parties on and around March 11, 2005. The settlement agreement states that RJS is the named insured under the Lloyds and Great American policies and that JPI qualifies as an additional insured under those policies. Under the terms of the settlement agreement, Lloyds paid $1 million, with $777,777.78 paid on behalf of RJS and $222,222.22 on behalf of JPI. Great American paid the remaining $3.9 million, with $3,033,333.33 paid on behalf of RJS and $866,666.67 on behalf of JPI. Great American's settlement payment on behalf of JPI was made subject to a full reservation of rights against Transcontinental. Also, JPI and Transcontinental agreed that any payment by Great American to compromise the judgment should not be deemed a voluntary payment.

D. *This Litigation*

On January 18, 2005, JPI filed a complaint for express contractual indemnity and declaratory relief against RJS and its insurers Great American and Lloyds.[1] In its complaint, JPI requested "that the court order RJS to indemnify JPI for the full amount of the jury verdict and any subsequent judgment in the underlying action pursuant to the terms of the express written indemnity agreement in the RJS/JPI contract." JPI also sought declaratory relief against Great American, alleging that "JPI and RJS clearly intended that RJS would be primarily responsible for fully indemnifying JPI . . . and JPI's own insurance carriers owe no obligation to pay any of the verdict entered in the underlying action."

On June 1, 2005, Great American filed a first amended cross-complaint for equitable subrogation and equitable indemnity against Transcontinental. In its cross-complaint, Great American alleged that any obligation it owed under its policy is subject to the terms and conditions of its policy. Further, Great American alleged it was entitled under equitable principles of subrogation to reimbursement from Transcontinental of its settlement payment on behalf of JPI. Great American also alleged it is entitled to equitable indemnification from Transcontinental "according to the terms of their respective policy provisions, including their 'limits of liability' and 'other insurance' clauses, as well as principles of equity," for its payment of Transcontinental's portion of the settlement.

E. *Motions for Summary Judgment*

On February 6, 2006, the parties filed their motions for summary judgment. Plaintiff JPI and cross-defendant Transcontinental filed a joint motion for summary judgment against RJS and Great American. In their motion for summary judgment, JPI and Transcontinental argued that the indemnity in the subcontract was triggered by the jury finding that JPI was not solely negligent. Relying on *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97] (*Rossmoor*), they further argued that the indemnity clause controls the priority of insurance between carriers. On these bases, JPI requested summary judgment on its cause of action for express contractual indemnity against RJS and on its cause of action for declaratory relief against Great American. Also, Transcontinental requested summary judgment "in connection with the cross-complaint for contribution filed against Transcontinental by Great American."

RJS filed a motion for summary judgment against JPI on the latter's claim for express contractual indemnity. RJS argued that JPI's claim should be

---

[1] JPI subsequently dismissed Lloyds from the suit on March 22, 2005.

dismissed as moot because any exposure JPI had to the judgment in the underlying case "evaporated when post-trial settlement was reached and satisfied by Lloyds and Great American." Also, RJS argued that if the trial court reached the issue of indemnity, RJS was entitled to summary judgment on the alternate grounds that the indemnification clause does not indemnify JPI for its own active negligence.

Great American filed separate motions for summary judgment against JPI and Transcontinental. In its summary judgment motion against JPI, Great American argued it was entitled to summary judgment on two grounds. First, Great American argued that JPI's claim against it does not present an actual controversy because it paid $866,666.67 on behalf of JPI as an additional insured to settle the underlying judgment against JPI. Second, Great American argued that it has no obligation under the indemnity provision in the subcontract because the indemnity provision does not trump the rule that as an excess carrier Great American's obligation is not triggered until the limits of the Transcontinental policy are exhausted.

In its summary judgment motion against Transcontinental, Great American argued it is entitled to equitable indemnification from Transcontinental for $866,666.67 that it paid on behalf of JPI as an additional insured under its policy to settle claims against JPI. As well, Great American argued it had established as undisputed facts the elements necessary to satisfy its cause of action against Transcontinental for equitable subrogation.

F. *Summary Judgment Rulings*

The trial court held a hearing on the summary judgment motions on March 30, 2006. Subsequently, the trial court entered two separate orders ruling on the various motions for summary judgment.

In the first of these, filed on April 12, 2006, the trial court granted RJS's motion for summary judgment on JPI's claim for express contractual indemnity. The trial court noted that JPI sued RJS "for express indemnity regarding the underlying wrongful death lawsuit. That lawsuit has been adjudicated at trial, and settled thereafter, with the entire judgment/settlement being paid by RJS's insurance carriers." On that basis, the trial court concluded that "the basis of [JPI's] cause of action is moot, as [JPI] no longer has any right of recovery against RJS." On similar grounds the trial court also granted Great

American summary judgment on JPI's declaratory relief claim. The trial court concluded there was no longer any controversy between JPI and Great American, again because "the entire judgment/settlement [was] paid by RJS's insurance carriers, including $3.9 million paid by Great American Insurance" so that the declaratory relief action "as pleaded in the Complaint is moot."

On May 1, 2006, the trial court issued its second order regarding the motions for summary judgment. Rejecting JPI's and Transcontinental's reliance on *Rossmoor, supra,* 13 Cal.3d 622, the trial court resolved the coverage issue in favor of Great American. In a nutshell, the trial court concluded the primary carrier of the indemnitee (here JPI) had to pay out before the excess carrier of the indemnitor (here RJS) was obliged to contribute. In accordance, the trial court granted Great American's motion for summary judgment on its cross-complaint against Transcontinental, ruling that Great American "is entitled to reimbursement and/or contribution in the amount of $866,666.67 from Transcontinental Insurance." The trial court also denied as moot (in light of its other summary judgment rulings) JPI's motion for summary judgment on its complaint against RJS and Great American, and Transcontinental's motion for summary judgment on Great American's cross-complaint for contribution and indemnity.

Notice of entry of judgment was filed on June 2, 2006. JPI and Transcontinental timely filed a notice of appeal on July 11, 2006.

## DISCUSSION

### A. *Standard of Review*

"Summary judgment is granted when the moving party establishes that there are no triable issues of any material fact. A summary judgment motion is directed to the issues framed by the pleadings. [Citations.] Further, the moving party must establish he or she is entitled to entry of judgment as a matter of law. [Citations.] . . . An appellate court reviews the trial judge's decision to grant summary judgment de novo. [Citations.] The trial judge's stated reason for granting summary judgment is not binding on us because we review its ruling, not its rationale. [Citations.]

". . . The standard of review of an insurance policy has been described by the California Supreme Court as follows: 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.] The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citation.] If contractual language is clear and explicit, it governs. [Citation.] . . . We review the unambiguous terms of the insurance agreement

de novo. [Citations.]' " (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1073–1075 [85 Cal.Rptr.2d 627] (*Reliance*).) Indemnity agreements are no different and "are to be interpreted under the same rules governing other contracts with a view to determining the actual intent of the parties." (*Ralph M. Parsons Co. v. Combustion Equipment Associates, Inc.* (1985) 172 Cal.App.3d 211, 221 [218 Cal.Rptr. 170] (*Ralph M. Parsons*).)

### B. *Great American's Cross-complaint for Equitable Subrogation*

We first consider the trial court's summary judgment ruling on Great American's cross-complaint against Transcontinental for equitable subrogation and equitable indemnification, because therein lies the principal issue on this appeal. JPI and Transcontinental assert that the trial court erred in granting summary judgment in favor of Great American. Relying principally on *Rossmoor, supra,* 13 Cal.3d 622, JPI and Transcontinental contend that pursuant to the indemnity clause in the subcontract, Transcontinental had no obligation to respond on behalf of JPI until exhaustion of RJS's primary and excess policies. On the other hand, Great American, relying principally on *Reliance, supra,* 72 Cal.App.4th 1063, contends that its secondary coverage does not apply until Transcontinental's primary coverage is exhausted.

### (1)

The facts underlying the Supreme Court's decision in *Rossmoor, supra,* 13 Cal.3d 622 were these: Rossmoor Sanitation, Inc. (Rossmoor), employed Pylon, Inc. (Pylon), to construct a sewage pump station. Under the terms of the contract, Pylon agreed to indemnify Rossmoor for damages arising out of the work. Pylon also agreed to obtain insurance and name Rossmoor in the policy as an additional insured. (*Rossmoor, supra,* 13 Cal.3d at pp. 625–626.) Thereafter, Pylon named Rossmoor as an additional insured under a policy issued to it by United States Fire and Insurance Company (U.S. Fire). Also, Rossmoor had its own coverage with Insurance Company of North America (INA). The U.S. Fire and INA policies each contained an "other insurance" clause stating that losses were to be apportioned if the insured held other insurance covering the loss. (*Id.* at p. 626.) Subsequently, one worker was killed and another injured when a trench collapsed. In an underlying tort action, the families of the workers sued Rossmoor and recovered a judgment. Rossmoor satisfied the judgment through its policy with INA. (*Id.* at p. 627.) Next, Rossmoor brought a declaratory action against Pylon and U.S. Fire, seeking indemnity for the sums it paid in satisfaction of the judgment in the underlying action. Rossmoor's claim for indemnification was based on its indemnity agreement with Pylon. U.S. Fire cross-complained against INA seeking apportionment between the carriers pursuant to the "other insurance"

clauses in the policies. After a bench trial, the trial court entered judgment in favor of Rossmoor and INA. (*Ibid.*)

On appeal to the Supreme Court, Pylon and U.S. Fire argued that the indemnity clause was nullified by Rossmoor's active negligence and that liability should be apportioned between the carriers. (*Rossmoor, supra*, 13 Cal.3d at p. 628.) After concluding that Rossmoor was entitled to the protection of the indemnity clause (*id.* at pp. 628–633), the court turned to the issue of liability between the two insurance companies. As an initial matter, the court agreed that "INA was subrogated to Rossmoor's right of indemnification since INA paid the . . . tort judgment for Rossmoor and since Rossmoor has a right of indemnity against Pylon." (*Rossmoor, supra*, 13 Cal.3d at p. 634.)

Next, the Supreme Court rejected Pylon and U.S. Fire's reliance on "the proposition that the terms of the insurance contracts requiring proration in case of other insurance should control, rather than the right to indemnification that exists between the parties insured by the contracts." (*Rossmoor, supra*, 13 Cal.3d at p. 634.) Noting that although this proposition might hold true "in tort suits arising out of automobile accidents," the court stated it did not apply in the case before it, which "concerns a contractual indemnity agreement, not theoretical noncontractual rights of indemnification between insureds." (*Ibid.*) The court added: "It appears that both INA and U.S. Fire calculated and accepted premiums with knowledge that they might be called upon to satisfy a full judgment. There is no evidence that either company knew there was or would be other insurance when they issued the policies. The fact that there is other insurance is a mere fortuitous circumstance. We view one factor as compelling, however: *to apportion the loss in this case pursuant to the other insurance clauses would effectively negate the indemnity agreement and impose liability on INA when Rossmoor bargained with Pylon to avoid that very result as part of the consideration for the construction agreement.* We therefore conclude that the rights of indemnity and subrogation must control, and are persuaded the trial court was correct in finding that because the U.S. Fire policy was part of the consideration for the construction job, it must be viewed as primary insurance under the facts of this case and that INA was subrogated to the rights of Rossmoor." (*Id.* at pp. 634–635, italics added.)

In sum, *Rossmoor* stands for the proposition that an insurer's subrogation of its insured's right to contractual indemnification controls in a battle of "other insurance" clauses between coinsurers. Key to the *Rossmoor* court's reasoning was the "compelling" fact that to "apportion the loss [between the insurers] pursuant to the other insurance clauses would effectively negate the indemnity agreement and impose liability on INA when Rossmoor bargained with Pylon to avoid that very result as part of the consideration for the

construction agreement." (*Rossmoor, supra*, 13 Cal.3d at p. 634.) Appellants argue *Rossmoor* controls here. Appellants contend the indemnity agreement in favor of JPI would be similarly negated if any liability was imposed on Transcontinental because, as in *Rossmoor*, JPI bargained with RJS to avoid that very result as part of the consideration for the construction agreement.

■ Despite such parallels, we do not agree that *Rossmoor* controls. The key distinction between *Rossmoor* and the case at bar is that *Rossmoor* involved a dispute between two *primary* carriers, each of whose polices contained an "other insurance" clause, on the issue of whether their respective liability on the loss should be settled on the standard basis of apportionment (see *Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1306 [77 Cal.Rptr.2d 296] ["law generally favors proration among carriers" in such cases]), or by subrogation to an insured's right to indemnity. Indeed, it is a basic rule of California insurance law that "an 'other insurance' issue can arise only between carriers on the same level of coverage." (*Carmel Development Co. v. RLI Ins. Co.* (2005) 126 Cal.App.4th 502, 513 [24 Cal.Rptr.3d 588].) But here we are faced with a subrogation claim by a secondary or excess carrier, Great American, and a primary carrier, Transcontinental. California insurance law recognizes a fundamental distinction between primary and excess insurance coverage: " ' "Primary coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability. [Citation.] Primary insurers generally have the primary duty of defense. [¶] 'Excess' or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." [Citation.] [¶] The "excess" insurance referred to in this definition is that secondary insurance which provides coverage after other identified insurance is no longer on the risk. . . . In short, excess insurance is insurance that is expressly understood by both the insurer and insured to be secondary to specific underlying coverage which will not begin until after that underlying coverage is exhausted and which does not broaden that underlying coverage. [Citation.]' [Citations.]" (*American Casualty Co. v. General Star Indemnity Co.* (2005) 125 Cal.App.4th 1510, 1521 [24 Cal.Rptr.3d 34], italics omitted; see also 15 Couch on Insurance (3d ed. 1999) Excess Insurance, § 219:18, p. 219-25 ["true excess insurance, which is written specifically to begin its coverage at a level well above the 'first dollar' of loss does not come into operation until the damage exceeds the maximum limitation of the primary policy"] (fn. omitted).)

### (2)

The distinction between primary and excess coverage was central to the appellate court's decision in *Reliance*, that *Rossmoor* did not control the issue

before it. In *Reliance*, Reliance National Indemnity Company (Reliance) sought complete indemnity from General Star Indemnity Company (General Star) for moneys it expended in defense and settlement of a lawsuit. (*Reliance, supra*, 72 Cal.App.4th at p. 1068.) The underlying lawsuit arose after a spectator at a rock festival was injured as a result of " 'crowd surfing.' " (*Id.* at p. 1070.) The festival was organized by Don Law Company (Don Law) and sponsored by Lollapalooza Joint Venture (Lollapalooza). Under the terms of the sponsorship contract, Don Law was required to indemnify Lollapalooza for losses due to personal injury. (*Id.* at p. 1068.) The contract also required Don Law to purchase liability insurance with policy limits of $5 million per occurrence and $5 million per event, and naming Lollapalooza as an additional insured. (*Ibid.*)

Gulf Insurance Company (Gulf) insured Don Law under a primary policy with an aggregate limit of $1 million. Lollapalooza was named as an additional insured to this policy in an endorsement to the policy. Don Law was also insured by General Star under an excess policy with limits of $10 million per occurrence and aggregate. Lollapalooza was an additional insured under the General Star policy. (*Reliance, supra*, 72 Cal.App.4th at p. 1069.) Lollapalooza also held a general liability policy with Reliance with a limit of $1 million. Reliance also insured Lollapalooza under an excess policy also with a limit of $1 million. (*Ibid.*) In the underlying lawsuit, which settled for $2,142,858, Reliance defended Lollapalooza and contributed $1 million to the settlement on its behalf, as well as $71,429 under the excess policy. Gulf defended Don Law and paid its policy limit of $1 million towards the settlement on behalf of Don Law and Lollapalooza. General Star contributed $71,429. (*Id.* at p. 1071.)

After the underlying action settled, Reliance sued Don Law's insurers, General Star, and Gulf for declaratory relief. Reliance asserted it was subrogated to the indemnification rights of its insured (Lollapalooza), and, as a consequence, it had no duty to indemnify Lollapalooza until General Star and Gulf paid their combined policy limits of $11 million. (*Reliance, supra*, 72 Cal.App.4th at p. 1071.) General Star cross-complained against Reliance for a declaration that General Star's duty to indemnify did not arise until the primary policies of Reliance and Gulf had exhausted. (*Ibid.*) After the parties filed cross-motions for summary judgment, the trial court entered judgment in favor of General Star and against Reliance. Reliance appealed. (*Id.* at p. 1073.)

The appellate court outlined the position of the parties: Reliance claimed error because "as a matter of law, under the . . . contract, Don Law was to provide full indemnity to Lollapalooza and its insurer for any damages arising from the festival. General Star counters that the indemnity agreement

does not supersede the explicit language of the relevant policies. Those policies provided that Reliance would be a primary insurer and that General Star's coverage would be excess to all other insurance." (*Reliance, supra,* 72 Cal.App.4th at pp. 1075–1076, fn. omitted.) The court acknowledged that "[u]nder well-settled insurance principles, there are two levels of insurance coverage, primary and excess. [Citations.]" (*Id.* at p. 1076.) The court also noted it is well settled under California law that " 'an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise until all of the primary insurance has been exhausted.' [Citations.]" (*Id.* at p. 1077, italics omitted.)

Building on these fundamental principles of California insurance law, the court explained why *Rossmoor* did not control. In the first place, "the duty to contribute applies to insurers that share the same level of obligation on the risk as to the same insured." (*Reliance, supra,* 72 Cal.App.4th at p. 1080.) But Reliance and General Star "do not share the same level of coverage and there is no right of contribution established." (*Id.* at pp. 1080–1081.) Rather, "Reliance's obligation was primary and General Star's was excess. General Star had no obligation for any part of the loss, damage, or defense covered by the other primary insurance. This is a materially distinguishing characteristic between the present litigation and *Rossmoor.*" (*Id.* at p. 1081.) Additionally, "*Rossmoor* did not purport to establish a general rule that a contractual indemnification agreement between an insured and a third party takes precedence over well-established general rules of primary and excess coverage in an action between insurers . . . . This is particularly true in this case because General Star's policy specifically states: 'Nothing herein shall be construed to make this Policy subject to the terms, conditions and limitations of other insurance, reinsurance or indemnity.' " (*Ibid.*; see also *Hartford Casualty Ins. Co. v. Mt. Hawley Ins. Co.* (2004) 123 Cal.App.4th 278, 298 [20 Cal.Rptr.3d 128] ["This is not to say that, under *Rossmoor,* an indemnity agreement always prevails over provisions in an insurance policy, as for example where there are two levels of insurance coverage, primary and excess."].)

Finally, the court concluded that the equities did not permit recovery for Reliance. The court stated: "Reliance's primary contention is that *Rossmoor* supports the theory that in *all* cases an indemnification agreement allows an insurer to be subrogated to the rights of its insured, even against an insurance company providing excess coverage. It is undisputed that the parties to the indemnity agreement are not present and this is an action between primary and excess carriers as identified by their policies. The risks involved in providing primary coverage are different from those involved in issuing an excess policy. These differences are reflected in part by the premium costs. As *Rossmoor* noted in discussing the risks of two primary insurers: 'It appears that both [insurers] calculated and accepted premiums with knowledge that they might be called upon to satisfy a full judgment. There is no evidence

that either company knew there was or would be other insurance when they issue the policies.' [Citation.] By contrast, an excess insurer does not accept premiums with the knowledge that it will be called upon to satisfy a full judgment. The California Supreme Court has noted: ' "The policyholder pays for two kinds of liability coverage, each at a different rate. The premium charged by the primary insurer supports more localized claims adjustment facilities than those of the excess carrier. It takes into account costs of defense, including legal fees, which the primary insurer normally provides." ' [Citations.] If we were to accept the arguments of Reliance, the basic rules construing primary and excess policies would be altered. A primary insurer would be allowed to charge a higher premium for insuring a greater risk; however, then the primary insurer would be allowed to shift the loss to an excess carrier which charged a lower premium. This is not a case between two primary carriers which have each received premiums for bearing the loss which ultimately occurred; rather, this is an action between an excess and a primary carrier. While the loss at issue must be borne by Reliance, it is nothing more than what is bargained for, particularly given the absence of any evidence that it calculated its premium with an understanding that an indemnity agreement would exist between its insured and Don Law. Under the circumstances, *Rossmoor*, a case involving a subrogation and indemnity dispute between two primary carriers and their insured is not controlling in the present case." (*Reliance, supra*, 72 Cal.App.4th at pp. 1082–1083.)

## (3)

*Reliance* is factually analogous to the case at bar and we find its reasoning highly persuasive. As in *Reliance*, this dispute is between an *excess* carrier, Great American, who filed its cross-complaint seeking equitable subrogation against a *primary* carrier, Transcontinental. Like Reliance, Transcontinental contends it is subrogated to the contractual indemnification rights of its insured, therefore its policy is secondary to *all* of JPI's policies, including its excess policy with Great American. We reject Transcontinental's contention for similar reasons to those outlined by the *Reliance* court.

First, "[t]he contractual terms of insurance coverage are enforced whenever possible." (*Reliance, supra*, 72 Cal.App.4th at p. 1076.) Great American contracted with RJS to provide a commercial umbrella policy. By the specific language of its contract, Great American undertook to pay on behalf of its insureds "sums *in excess of* the 'Retained Limit' that the 'Insured' becomes legally obligated to pay." (Italics added.) The "retained limit" is "the total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance *and the applicable limits of any other insurance providing coverage to the 'Insured'* during the Policy Period." The undisputed facts here show JPI was an additional insured

under the Great American policy and that JPI was covered by the Transcontinental policy for the damages arising from the accident. Thus, under the terms of Great American's policy, it was excess to the Transcontinental policy. ■ Accordingly, having paid a portion of the settlement funds on behalf of Transcontinental, it was entitled to seek reimbursement from Transcontinental by way of its cross-complaint for equitable subrogation. (*Reliance, supra,* 72 Cal.App.4th at pp. 1078–1079 ["where different insurance carriers cover differing risks and liabilities, they may proceed against each other for reimbursement by subrogation rather than by contribution. [Citations.]"].)

Moreover, like the *Reliance* court, we do not think the equities favor the primary carrier, Transcontinental. First, we share the extremely important concerns voiced by the *Reliance* court that "the basic rules construing primary and excess policies would be altered" if we accepted Transcontinental's argument. (*Reliance, supra,* 72 Cal.App.4th at p. 1083.) Second, a finding in favor of Great American does not entirely negate the indemnity clause of the subcontract, as claimed by JPI. (Cf. *Rossmoor, supra,* 13 Cal.3d at p. 634 [permitting one primary insurer to subrogate to the indemnification rights of its insured as against another primary insurer because to do otherwise "would effectively negate the indemnity agreement"].) That is because JPI was insured by Lloyds as well as Great American. The Lloyds policy was listed in the schedule of underlying insurance to the Great American policy and was also primary insurance. Under *Rossmoor,* Transcontinental would have been entitled to subrogate to JPI's right to contractual indemnification against Lloyds had the damages in the case been $1 million (the Lloyds policy limit) or less. Unfortunately, the injured worker in the underlying action was killed, and the damages exceeded the limit of the Lloyds policy. Third, it was within JPI's power to provide for such an eventuality via the insurance requirements specified in the subcontract. The record shows JPI required all contracting parties to provide, at a minimum, proof of insurance of (1) general liability coverage in the amount of $1 million per occurrence and (2) excess coverage in the amount of $2 million per occurrence. Nothing prevented JPI from calling for a much higher level of primary insurance from its subcontractors if it was concerned about protecting the interests of its own primary insurers. As it was, the insurance clause in the JPI-RJS contract gave JPI the power of review over any insurance purchased by RJS in order to satisfy the insurance requirements of the contract, but there is nothing in the record to suggest JPI questioned RJS's insurance coverage at any time *before* the accident. Fourth, a finding in favor of Great American does no injustice to Transcontinental. As a primary insurer, Transcontinental contracted to provide liability coverage to the liability limits of $1 million per occurrence. There is no evidence whatsoever that Transcontinental set the premiums for the general liability

coverage it provided to JPI on an understanding that its policy would be secondary to the General American policy.

Moreover, appellants' attempt to distinguish *Reliance* is unpersuasive. Appellants state that *Reliance* does not apply here because the *Reliance* court "did not have the benefit of a conclusive liability determination" between the insureds as we do here, so the court "could not find that the indemnitor owed contractual indemnity to the indemnitee." This distinction is immaterial because it did not affect the *Reliance* court's analysis. The issue of liability was raised on appeal by Reliance, who contended there was insufficient evidence of any active negligence by Lollapalooza. (*Reliance, supra,* 72 Cal.App.4th at p. 1075, fn. 1.) Active negligence by Lollapalooza would have *negated* the indemnity clause. (See *id.* at p. 1068.) However, the court stated that "we do not discuss the issue of Lollapalooza's negligence because the appeal may . . . be resolved on other grounds." (*Id.* at p. 1075, fn. 1.) Thus, for purposes of its analysis, the *Reliance* court apparently assumed the indemnity clause was effective.

Appellants also attempt to distinguish *Reliance* on the basis that the General Star excess policy in *Reliance* specifically stated that it could not be modified by any indemnity agreement, whereas the Great American policy did not contain such a limitation. This distinction was not material to the *Reliance* court's analysis, which focused on the crucial distinction between primary and secondary levels of coverage as reflected in the *coverage provisions* of the respective policies, not the "other insurance" clauses of those policies. (See *Reliance, supra,* 72 Cal.App.4th at pp. 1080–1081.)

In sum, we conclude that *Rossmoor* is inapposite and are persuaded that *Reliance* is applicable to the undisputed facts presented here.[2] Thus, Transcontinental is not entitled to indemnification by Great American on the

---

[2] The only authority contrary to *Reliance* cited by appellants is *Wal-Mart Stores, Inc. v. RLI Ins. Co.* (8th Cir. 2002) 292 F.3d 583, 591 (holding that Arkansas would not adopt "the approach of *Reliance* to resolve this case"). In the first place, " 'federal decisional authority is neither binding nor controlling in matters involving state law.' [Citation.]" (*Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 55 [134 Cal.Rptr.2d 420].) Nor, as explained above, do we agree with the *Wal-Mart* court's assertion that *Reliance* conflicts with *Rossmoor*. Moreover, in *Wal-Mart*, the purported secondary carrier (RLI) relied on language in the "other insurance" clause of its policy for its assertion that its policy was excess to Wal-Mart's primary insurer, National Union, whose policy also contained a "competing 'other insurance' clause." (*Wal-Mart, supra,* 292 F.3d at pp. 586–587.) But under California law, "[a]n 'other insurance' dispute can only arise between carriers on the same level, it cannot arise between excess and primary insurers. [Citation.]" (*North River Ins. Co. v. American Home Assurance Co.* (1989) 210 Cal.App.3d 108, 114 [257 Cal.Rptr. 129].) Thus, it is questionable whether *Wal-Mart* actually involved a dispute between insurers on different levels of the risk. (See 15 Couch on Insurance, *supra,* § 219:18, p. 219-25, fn. 78 ["True excess insurance must be distinguished

basis of the indemnification clause in the construction contract between JPI and RJS. Accordingly, we affirm the trial court's award of summary judgment in favor of Great American, and against Transcontinental, on Great American's claim for equitable subrogation against Transcontinental.[3]

## C. *JPI's Complaint for Express Contractual Indemnity and Declaratory Relief*

JPI contends the trial court erred in granting summary judgment in favor of RJS on its complaint against RJS and Great American for express contractual indemnity and declaratory relief, respectively. We disagree.

In its complaint, JPI asserted a cause of action for declaratory judgment against Great American. On this cause of action, JPI asked the court to "make and enter a binding judicial declaration in accordance with JPI's contentions set forth in the second cause of action." Among those contentions were the following: "An actual controversy has arisen and now exists between JPI . . . and Great American with respect to . . . Great American's duties to JPI and RJS under the . . . Great American polic[y] issued to RJS; [¶] JPI contends

---

from insurance which is written to be primary, but includes an 'other insurance' clause making it excess in those circumstances in which another policy, also written to be primary, applies to the loss."].)

[3] The trial court's order stated: "Great American is entitled to reimbursement and/or contribution in the amount of $866,666.67 from Transcontinental Insurance." As noted above, the right to "contribution" arises when several insurers cover the same risk and one pays more than its share of the loss, so generally "there is no contribution between a primary and an excess carrier." (*Reliance, supra,* 72 Cal.App.4th at p. 1078, citing *Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra,* 65 Cal.App.4th at p. 1294, fn. 4.) This does not affect the trial court's ruling, however, because "where different insurance carriers cover differing risks and liabilities, they may proceed against each other for reimbursement by subrogation rather than by contribution. [Citations.]" (*Reliance, supra,* 72 Cal.App.4th at pp. 1078–1079.) And the undisputed facts show Great American is entitled to judgment as a matter of law on its claim for equitable subrogation against Transcontinental in the amount of $866,666.67. (See *Fireman's Fund, supra,* 65 Cal.App.4th at p. 1292 ["essential elements of an insurer's cause of action for equitable subrogation are as follows: (a) the insured suffered a loss for which the defendant is liable . . . ; (b) the claimed loss was one for which the insurer was *not* primarily liable; (c) the insurer has compensated the insured in whole or in part for the same loss for which the defendant is primarily liable; (d) the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; (e) the insured has an existing, assignable cause of action against the defendant which the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer; (f) the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; (g) justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and (h) the insurer's damages are in a liquidated sum, generally the amount paid to the insured."].)

that . . . Great American owe[s] an obligation to fully indemnify JPI as an additional insured for the jury verdict and any subsequent judgment entered in the underlying action and [that] JPI's *own insurance carriers owe no obligation to pay any of the judgment* entered in the underlying action" on account of the indemnity provision in the subcontract. However, pursuant to the foregoing analysis of *Reliance, supra,* 72 Cal.App.4th 1063, we have already concluded that Transcontinental is not entitled to indemnification by Great American on the basis of the indemnification clause in the construction contract between JPI and RJS. Accordingly, we also affirm the trial court's award of summary judgment in favor of Great American, and against JPI, on JPI's declaratory relief claim against Great American.

As to its claim for express contractual indemnification against RJS, JPI contends the trial court erroneously granted summary judgment in favor of RJS on the grounds that RJS's insurers had paid the entire judgment. On this question, it bears repeating that "[a] summary judgment motion is directed to the issues framed by the pleadings." (*Reliance, supra,* 72 Cal.App.4th at p. 1073.) In its complaint, JPI claimed express contractual indemnity against RJS. But the undisputed facts show that JPI tendered defense of the underlying action to RJS and its insurers, Lloyds and Great American: Lloyds and Great American accepted defense of the action on behalf of JPI; Lloyds and Great American tried the case, and following an adverse jury verdict negotiated a full and complete settlement on behalf of JPI and RJS for total damages of $4.9 million; Lloyds and Great American between them paid the $4.9 million settlement in full—Lloyds paid its policy limit of $1 million and Great American paid $3.9 million; JPI did not have to pay anything towards the settlement. On these undisputed facts, the trial court properly granted summary judgment in favor of RJS on its claim for express contractual indemnification because the undisputed facts demonstrate that RJS indemnified JPI in full.[4]

---

[4] Nevertheless, we reject RJS's contention that we may affirm the trial court's summary judgment ruling on the alternate basis that the indemnification clause is inapplicable under these facts, therefore no duty arose for RJS to indemnify JPI. On the contrary, we conclude the contractual indemnification clause at issue here is plainly *not* a general indemnity agreement. (*Ralph M. Parsons, supra,* 172 Cal.App.3d at p. 220 ["A general indemnity agreement is one *that does not address and is silent* with respect to the issue of the indemnitee's negligence"] (italics added).) Applying the reasoning of the *Ralph M. Parsons* court here: "Since only loss or damage caused solely by [JPI's] negligence was excluded, loss or damage resulting from the combined negligence of [RJS and JPI], whether active or passive, was necessarily included." (*Ralph M. Parsons, supra,* 172 Cal.App.3d at p. 220.) Our conclusion is solidified further by the fact that the indemnity provision in this case also specifically covered JPI for damages where JPI is *jointly negligent* with RJS. Accordingly, under the undisputed facts presented here (JPI was 20 percent at fault and RJS was 70 percent at fault), application of the indemnification clause in favor of JPI was not precluded by negligence attributable to JPI.

## DISPOSITION

The judgment is affirmed. Respondents Great American and RJS are entitled to their costs on appeal.

McGuiness, P. J., and Pollak, J., concurred.