188 Cal.App.4th 1452 (2010)
ARROWOOD INDEMNITY COMPANY, Plaintiff and Appellant,
v.
TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, Defendant and Respondent.
No. B219491.
Court of Appeals of California, Second District, Division Four.
October 6, 2010.
*1455 Musick, Peeler & Garrett, David A. Tartaglio and Teresa Cho for Plaintiff and Appellant.
Gordon & Rees, Michelle R. Bernard, Christopher R. Wagner and George P. Soares for Defendant and Respondent.

*1456 OPINION
SUZUKAWA, J.

INTRODUCTION
Two insurers issued commercial general liability (CGL) policies to the same insured in different years. Several years later, the insured, a general contractor, was sued for negligence allegedly committed during the second policy period, and it tendered its defense to the second insurer. The second insurer learned during discovery that the insured also had done work for plaintiff during the first policy period, and it asked the first insurer to participate in the defense. The first insurer did so. However, after the jury returned a verdict against the insured, the first insurer refused to indemnify the insured, asserting that the jury had found negligence only during the second policy period. The second insurer indemnified the insured and then sued the first insurer for equitable contribution. It lost after a bench trial, and this appeal followed.
We conclude that the jury's verdict against the insured did not clearly indicate whether the jury found negligence during the first policy period, the second policy period, or both. We thus address the following issue of first impression: Which insurer bears the burden of proving the existence (or nonexistence) of coverage in a case like the present one, where one insurer has participated in the defense and/or indemnity of an insured and the other has not? We hold that in an action for equitable contribution brought by an insurer who has defended and indemnified an insured against a coinsurer who has not defended or has not indemnified the insured, the participating insurer has met its burden of proof when it makes a prima facie showing of coverage under the nonparticipating insurer's policythe same showing necessary to trigger the recalcitrant insurer's duty to defend. The burden of proof then shifts to the nonparticipating insurer to prove the absence of actual coverage. Here, because the first insurer failed to meet its burden of proving the absence of coverage, we reverse and remand to allow the trial court to allocate equitably defense and indemnity costs.

FACTUAL AND PROCEDURAL HISTORY

I. The Insurance Policies

Travelers Indemnity Company of Connecticut issued a CGL policy to Krata, Inc., doing business as Five Star Services, effective July 1, 2000, to July 1, 2001 (the Travelers policy). Arrowood Indemnity Company (as successor in interest to Royal Surplus Lines Insurance Company) issued a *1457 CGL policy to Five Star, effective July 1, 2002, to July 1, 2003 (the Arrowood policy).[1] Each policy had a liability limit of $1 million per occurrence and $2 million in the aggregate.
The Arrowood and Travelers policies contained identical policy language. As relevant here, the policies provided that the insurers "will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies." Further, "[w]e will have the right and duty to defend the insured against any `suit' seeking those damages. However, we will have no duty to defend the insured against any `suit' seeking damages for `bodily injury' or `property damage' to which this insurance does not apply."
The policies applied to "bodily injury" and "property damage" if "(1) The `bodily injury' or `property damage' is caused by an `occurrence' that takes place in the `coverage territory'; and [¶] (2) The `bodily injury' or `property damage' occurs during the policy period." An "occurrence" "means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" means: "(a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or [¶] (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the `occurrence' that caused it."
Both policies had identical supplementary payment provisions, providing coverage for "[a]ll costs taxed against the insured" in any suit "we [the insurer] defend," and for prejudgment and postjudgment interest.

II. The Underlying Action

On January 7, 2005, Ron and Maureen Ashley (the Ashleys) filed a complaint against Ruth and George Dunmore (the Dunmores) in an action entitled Ashley v. Dunmore (Super. Ct. Sacramento County 2007, No. 05AS00066) (the underlying action). The complaint alleged that in November 2002, the Ashleys agreed to purchase the Sunflorin Village Apartment Complex (Sunflorin or the property) from the Dunmores. Immediately prior to the sale, the Dunmores or their property manager, FPI Management, Inc. (FPI), hired Five Star to remediate dry rot in the property's exterior wood siding, trim, and decks. While doing the repair work, the Dunmores and FPI discovered "substantial and pervasive dry rot damage to the Property's exterior building *1458 envelope, wood siding, trim, decks and balconies." The dry rot "in many instances compromised the structural integrity of the balconies and guard rails, posing serious safety risks to the tenants and visitors to the Property." Nonetheless, because the Dunmores had decided to sell the property, "they elected to not correct the safety hazards and/or replace the dry rotted wood, but instead to conceal the dry rot damage by, among other things, fastening new trim to defective wood, or covering the dry rot damage with new paint." The Dunmores did not disclose the existence of the dry rot damage to the Ashleys, and the Ashleys did not discover it until after the close of escrow.
On March 16, 2005, the Dunmores cross-claimed against FPI and Five Star. They alleged that "[i]n or about November of 2002, FPI and Five Star entered into an agreement evidenced by one or more writings (`the Remediation Agreement') in which Five Star agreed to perform dry rot remediation at the Property. The Dunmores are informed and believe and thereon allege that, in the Remediation Agreement, Five Star agreed, among other things, to locate and replace wooden structures on the Property which were affected by dry rot." However, "FPI and/or Five Star intentionally or negligently failed to locate and replace or otherwise remediate wooden structures on the Property which were affected by dry rot, and performed their work in such a manner as to cover some dry rot conditions on the Property with new wooden structures so that the dry rot conditions were no longer visible." Accordingly, "[a]n actual controversy has arisen and now exists between the Dunmores and [FPI and Five Star] in that the Dunmores contend, and [FPI and Five Star] deny, that, as between the Dunmores and [FPI and Five Star], responsibility, if any, for the damages claimed by [the Ashleys] herein rests entirely or partially on [FPI and Five Star], and that, as a result, [FPI and Five Star] are obligated to partially or fully indemnify the Dunmores for any sums, including attorneys' fees, expenses, and costs of suit, that the Dunmores may incur in defense of [the Ashleys'] Complaint, as well as for any damages, judgment, attorneys' fees, expenses, costs of suit, or other awards recovered by [the Ashleys] against the Dunmores."

III. Tender of the Underlying Action

Five Star tendered the defense of the underlying action to Arrowood in June 2005. On July 5, 2005, Arrowood agreed to defend Five Star under a reservation of rights.
On May 10, 2006, Arrowood tendered Five Star's defense to Travelers. Arrowood advised Travelers that its initial investigation indicated that Five Star had done dry rot repair at Sunflorin during Arrowood's policy period *1459 (July 1, 2002, to July 1, 2003), but "[f]urther investigation with the named insured and the property manager determined there were proposals/contracts for dry rot repair that dated back to your [(Travelers's)] policy period."
By letter of September 11, 2006, Travelers agreed to defend Five Star. It stated that it had completed its review of the "facts, pleadings, and the policy provisions of the Travelers Property Casualty Insurance Company (`Travelers') policy issued to [Five Star]," and having done so, agreed to "participate in the defense of Five Star under a reservation of rights."

IV. Trial of the Underlying Action

The underlying action went to trial before a jury. On October 20, 2006, the jury returned a special verdict, finding that Five Star was liable for negligence and the Ashleys were contributorily negligent. It also found that the Ashleys' total damages for dry rot repairs were $717,358 and Five Star and the Ashleys were each 50 percent responsible for the damages.
Five Star brought motions for new trial and for judgment notwithstanding the verdict. The trial court denied both motions.
As against Five Star, the trial court awarded the Dunmores attorney fees of $205,661 and costs of $50,589. Accordingly, the total award against Five Star was $358,679 (50 percent of damages award) + $205,661 (attorney fees) + $50,589 (costs) + $4,176 (postjudgment interest) = $619,105.
Travelers refused to indemnify Five Star for any portion of the compensatory damages award, but it paid $53,471 of the attorney fee award.[2] It also paid a portion ($28,606) of the fees and costs incurred to defend Five Star in the underlying action from the May 10, 2006 tender. Arrowood indemnified Five Star for the balance of the judgment ($565,673), and it paid the balance of the fees and costs incurred to defend Five Star ($225,213).

V. The Present Action

On January 24, 2008, Arrowood filed the present action for declaratory relief, indemnity, contribution, subrogation, and reimbursement against Travelers. Travelers answered, denying the allegations of the complaint and asserting 11 affirmative defenses, including that Arrowood's claims were barred "to the extent that the underlying claims asserted against [Five Star] are not actually *1460 covered or potentially covered under the Travelers policy" and that "the alleged `property damage' at issue in the underlying action filed against Five Star did not occur during the effective policy period of the Travelers policy alleged in the Complaint." Travelers also cross-claimed against Arrowood for declaratory relief, equitable indemnity, equitable contribution, and equitable subrogation, asserting that based on the jury's special findings in the underlying action, Arrowood should be ordered to reimburse Travelers for all of the sums Travelers contributed to Five Star's defense, as well as for the $53,471 Travelers paid to indemnify Five Star.
Travelers and Arrowood filed cross-motions for summary judgment, seeking adjudication of their respective defense and indemnity obligations to Five Star. On January 5, 2009, the trial court denied both motions, explaining its ruling as follows: "The special verdict form did at least arguably resolve the controverted . . . factual issues in the underlying case, those being liability and damages. But that jury was not asked to make any actual findings as to whether any dry rot work done by Five Star in the year 2000, which would have fallen into the Traveler[s] policy, whether that work caused or contributed to the necessity for any later work . . . . Those kinds of questions, apparently, from my read, weren't in front of the jury. And these issues, really, concern more the coverage and contributions issues as between the two insurers, not the liability and damages that the jury was asked to assess. I don't think that I can conclude, based on what I've seen here, that there is no potential for coverage in terms of the Traveler[s] policy, and I think the matter has to proceed to trial."
The case was tried to the court on June 25, 2009. The parties stipulated to the introduction of many facts and exhibits and there was no live testimony.[3] At the conclusion of argument, the trial court ruled that Travelers had no duty *1461 to defend or indemnify with respect to the underlying action, and thus it entered judgment for Travelers in the amount of $97,838.75, representing the costs and fees it paid to Five Star in connection with the underlying action. The court stated as follows:
"I am finding that there was no duty to defend on behalf of Travelers. The verdict form deals specifically with the ... year 2002/2003. That's question one of the verdict. And the complaint that was operative in this lawsuit listed those dates as between 2002/2003 as being the dates for which ... Five Star Service[s's] work was being questioned. The Travelers' policy had expired before the date here.
"Now, it came to be that some information was gleaned and Travelers was put on notice at a later time. And they decided, I think, erroneously, and decided in an overabundance of cautionmaybe because of bad faith considerations. I don't know. They decided that they would defend under reservations of rights. And, in so doing, they ended up paying $53,000 and change as a contribution toward the ultimate decision.
"I think that Montrose [Chemical Corp. v. Superior Court (1993) 6 Cal.4th 287 [24 Cal.Rptr.2d 467, 861 P.2d 1153]] and Buena Vista [Mines, Inc. v. Industrial Indemnity Co. (2001) 87 Cal.App.4th 482 [104 Cal.Rptr.2d 557]] are the controlling cases. Having decided the initial issue of a duty to defend ..., I don't need to, thereafter, get to the duty to indemnify, and I don't need to get to an allocation there. If the duty to defend does not exist, then the duty to indemnify does not exist, and there needs to be no allocation.
"The remedial work that was done by Five Star in 2002/2003 under the Arrowood or SurplusArrowood policy was found by the jury to have been negligently done. The scope of that work was expanded over whatever work they did in the year 2000 and should have included remediation work for any work in 2000. The jury found that the negligence that occurred was in the 2002 to 2003 area. That's sufficient, I think, for my determination.
"I suppose we can look back at the special verdict form. That's where fault has been found here. Maybe it could have been crafted a little better. I think, on balance, that it worked out because the evidence of the work done was under the Arrowood's policy period.
"So I have not taken the plaintiff's arguments lightly. I've read the cases, but I think this is the proper conclusion."
Judgment was entered on August 13, 2009, and notice of entry of judgment was served on August 17, 2009. Arrowood timely appealed.

*1462 CONTENTIONS ON APPEAL
Arrowood contends that Travelers owed Five Star a duty to defend and a duty to indemnify. Further, because Arrowood and Travelers had equal "time on the risk"each insured Five Star for one yearArrowood contends that Travelers is responsible for 50 percent of the costs of defense ($253,819 ÷ 2 = $126,909), 50 percent of the "supplementary payments" (attorney fees, costs, and interest) ($260,425 ÷ 2 = $130,212), and 50 percent of the damages award ($358,679 ÷ 2 = $179,339).
Travelers contends that it did not owe Five Star either a duty to defend or a duty to indemnify. Thus, it urges that the trial court properly ordered Arrowood to reimburse it for all sums (defense and indemnity) it paid on Five Star's behalf. In the alternative, Travelers contends that even if it owed a duty to defend, its share of defense costs should be based on the percentage of work performed during each insurer's policy period. Specifically, Travelers asserts that Five Star did approximately 26 percent of its work during Travelers's policy period, and 74 percent of its work during Arrowood's policy period. Thus, Travelers urges that it should be responsible for no more than 26 percent of Five Star's defense costs.

STANDARD OF REVIEW
"`Where, as here, a case is tried on stipulated facts and documentary evidence, we make our own determination of the questions of law presented by the stipulated facts. [Citation.]' (Mercedes-Benz Credit Corp. v. Johnson (2003) 110 Cal.App.4th 53, 56 [1 Cal.Rptr.3d 396].)" (Baccouche v. Blankenship (2007) 154 Cal.App.4th 1551, 1554 [65 Cal.Rptr.3d 659]; see also Air China Limited v. County of San Mateo (2009) 174 Cal.App.4th 14, 18 [93 Cal.Rptr.3d 893]; Kettenring v. Los Angeles Unified School Dist. (2008) 167 Cal.App.4th 507, 512 [84 Cal.Rptr.3d 196].)[4]

DISCUSSION

I. Travelers Owed Five Star a Duty to Defend

The Travelers policy provided that it would "have the right and duty to defend [Five Star] against any `suit' seeking ... damages" for "`bodily *1463 injury' or `property damage'" that occurred "during the policy period." Travelers concedes that the underlying action sought damages for "property damage," but it contends that the property damage did not occur "during the policy period." Thus, it urges, it had no duty to defend. Arrowood disagrees; it contends that the evidence it provided to Travelers when it tendered the case in May 2006 was sufficient to create a potential for coverage and, thus, that Travelers had a duty to defend. For the reasons that follow, we agree with Arrowood and conclude that Travelers owed Five Star a duty to defend.

A. The Duty of Defense Generally

(1) The law governing an insurer's duty of defense is well settled. "An insurer must defend its insured against claims that create a potential for indemnity under the policy. [Citations.] ... [¶] ... [¶] The defense duty arises upon tender of a potentially covered claim and lasts until the underlying lawsuit is concluded, or until it has been shown that there is no potential for coverage. [Citation.] When the duty, having arisen, is extinguished by a showing that no claim can in fact be covered, `it is extinguished only prospectively and not retroactively.' [Citations.]' [Citation.] ... [¶] On the other hand, `in an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend. [Citation.] ... [¶] From these premises, the following may be stated: If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." (Scottsdale Ins. Co. v. MV Transportation (2005) 36 Cal.4th 643, 654-655 [31 Cal.Rptr.3d 147, 115 P.3d 460].)
The Supreme Court broadly construed an insurer's duty to defend in the seminal case of Gray v. Zurich Insurance Co. (1966) 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168] (Gray). There, Gray was the defendant in a suit alleging intentional assault. Gray notified his insurer of the suit, claiming coverage under a comprehensive personal liability policy in which the insurer agreed to "`defend any suit against the insured alleging ... bodily injury or property damage'" unless the bodily injury or property damages were "caused intentionally by or at the direction of the insured." (Id. at p. 267.) The insurer refused to defend Gray on the ground that the claims against him alleged an intentional tort that fell outside the policy's coverage. (Ibid.) Gray unsuccessfully defended on a theory of self-defense, and judgment of $6,000 was entered against him. (Ibid.)
*1464 (2) Gray sued the insurer for breach of the duty to defend. The Supreme Court concluded that the insurer had breached its duty: "[The insurer] cannot construct a formal fortress of the third party's pleadings and retreat behind its walls. The pleadings are malleable, changeable and amendable.... [Thus,] courts do not examine only the pleaded word but the potential liability created by the suit.... [¶] ... [¶] Since modern procedural rules focus on the facts of a case rather than the theory of recovery in the complaint, the duty to defend should be fixed by the facts which the insurer learns from the complaint, the insured, or other sources. An insurer, therefore, bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy." (Gray, supra, 65 Cal.2d at pp. 276-277, italics added.) In the present case, the insurer had a duty to defend because the complaint presented the potential for a judgment based on nonintentional conduct: "[The underlying complaint] clearly presented the possibility that [the plaintiff] might obtain damages that were covered by the indemnity provisions of the policy. Even conduct that is traditionally classified as `intentional' or `wilful' has been held to fall within indemnification coverage. [Fn. omitted.] Moreover, despite [the plaintiff's] pleading of intentional and wilful conduct, he could have amended his complaint to allege merely negligent conduct. Further, [Gray] might have been able to show that in physically defending himself, even if he exceeded the reasonable bounds of self-defense, he did not commit wilful and intended injury, but engaged only in nonintentional tortious conduct. Thus, even accepting the insurer's premise that it had no obligation to defend actions seeking damages not within the indemnification coverage, we find, upon proper measurement of the third party action against the insurer's liability to indemnify, it should have defended because the loss could have fallen within that liability." (Id. at p. 277.)
The court reached a similar result in Mullen v. Glens Falls Ins. Co. (1977) 73 Cal.App.3d 163 [140 Cal.Rptr. 605] (Mullen). There, the defendant insurer issued a comprehensive personal liability policy to the Santoses. The policy provided that the insurer would defend the Santoses or members of their household in any suit against them alleging bodily injury caused by an "occurrence" (defined as "an accident"), but it excluded coverage for bodily injury arising out of the use of a motor vehicle. (Id. at pp. 165-166.) While the policy was in effect, the plaintiff sued the Santoses' son, Anthony, for assault and battery, alleging that while the plaintiff was filling Anthony's car with gasoline, Anthony intentionally assaulted him. (Id. at p. 166.) The insurer declined to defend the suit, noting that the policy did not cover intentional acts or acts proximately caused by the operation of an automobile. (Id. at p. 167.) Judgment was entered against Anthony; the plaintiff (as Anthony's assignee) then commenced an action against the insurer for damages for failure to defend. (Id. at p. 168.)
*1465 The court held that the insurer breached its duty to defend. It noted that if it were to look only to the plaintiff's complaint in his personal injury action against Anthony, it would be "tempted to agree with Glens Falls' position that it was not obligated to provide [Anthony] with a defense in that lawsuit; the allegations of the complaint suggest that the operation and use of the Chevrolet automobile ... was somehow connected with plaintiff's injuries, and Glens Falls' insurance policy excluded coverage for bodily injury or property damage arising out of the `ownership, maintenance, operation, use, loading or unloading of any automobile.'" (Mullen, supra, 73 Cal.App.3d at p. 169.) Likewise, if it were "to be guided solely by the judgment acquired by plaintiff against Anthony Santos in the personal injury action and by plaintiff's subsequent deposition, we would have no alternative but to declare that the incident of February 23, 1969, was not covered by the insurance policy. According to the deposition, [plaintiff] was savagely assaulted by Anthony Santos with a tire iron, without provocation, and the term `occurrence' within the ambit of the coverage provided by the policy does not include bodily injuries or property damage `expected [or] intended from the standpoint of the insured.'" (Ibid.) The court noted, however, that an insurance company must defend any lawsuit brought against its insured that potentially seeks damages covered by the policy, and an insurer's duty to defend is not determined merely by looking to the underlying complaint or judgment. (Ibid.) Instead, the "crucial question" is "whether Glens Falls was in possession of factual information which gave rise to potential liability under its policy when the company denied Anthony Santos a defense in plaintiff's personal injury action." (Id. at p. 170.) The court concluded that it was: "The insurance company had been notified by [its agent] that plaintiff received a head injury in a fight with Anthony Santos when he was struck by Santos with a tire iron and that she did not have all of the details of the incident. Accordingly, despite the allegations of the complaint in plaintiff's personal injury action which were even somewhat ambiguous on the point of whether the operation and use of an automobile were involved in causing plaintiff's injuries, when Glens Falls denied Anthony Santos a defense it had information in its possession which showed that the operation and use of an automobile had no causal connection with plaintiff's injuries [citations] and that the alleged injuries were the result of a fight; for all the insurance company could have known at that time, plaintiff started the fight and was struck by Santos in self-defense. It is now settled that injuries resulting from acts committed by an insured in self-defense are not `intended' or `expected' within the meaning of those terms as customarily used in an exclusionary clause like the one involved in the present case." (Ibid.)

*1466 B. Travelers Owed Five Star a Duty of Defense Because the Allegations of the Complaint and Facts Known to Travelers Created a Potential for Coverage

As in Gray and Mullen, we begin our analysis of Travelers' sduty to defend with the allegations of the underlying complaints. Travelers correctly notes that the Ashleys' complaint alleges that the Dunmores and FPI hired Five Star to repair dry rot at the Sunflorin property "on or about November 2002." The cross-complaint is similar; it alleges that "[i]n or about November of 2002, FPI and Five Star entered into an agreement evidenced by one or more writings (`the Remediation Agreement') in which Five Star agreed to perform dry rot remediation at the Property." Considered alone, therefore, the underlying complaints would not give rise to a duty to defend because the alleged tortious conduct occurred in November 2002, more than a year after the Travelers policy expired.
Gray and Mullen are clear, however, that in considering Travelers's duty to defend, we must look beyond the allegations of the underlying complaints to the facts the insurer learned from "the insured ... or other sources." (Gray, supra, 65 Cal.2d at p. 276.) As relevant to that inquiry, it is undisputed that in May 2006, Arrowood advised Travelers that it had determined that Five Star had contracted to do dry rot repair at Sunflorin in August and October 2000. Further, Arrowood provided Travelers with copies of the relevant proposal/contracts, dated August 2, 2000, August 3, 2000, and October 3, 2000. Thus, at least by May 2006, Travelers was on notice that Five Star had performed dry rot repair work at Sunflorin during its policy period.
The question, therefore, is whether Travelers's knowledge that Five Star performed dry rot repair in 2000 was sufficient to trigger a duty to defend, notwithstanding the fact that the underlying complaints did not rely on the 2000 repairs as a basis for liability. We believe that it was. As we have said, "that the precise causes of action pled by the third party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability." (Scottsdale Ins. Co. v. MV Transportation, supra, 36 Cal.4th at p. 654.) Here, we believe that the underlying complaints could have been fairly amended to state a claim against Five Star for which coverage existed under the Travelers policy. Although at time of tender the complaint and cross-complaint alleged only that Five Star had "intentionally or negligently failed to locate and replace or otherwise remediate wooden structures on the Property which were affected by dry rot" in 2002, the Ashleys easily could have amended their complaint to allege identical tortious conduct in 2000, when Five Star first performed *1467 dry rot repair at Sunflorin. Accordingly, when Arrowood submitted its tender of defense to Travelers in 2005, Travelers's duty to defend attached.[5]
Citing Storek v. Fidelity & Guaranty Ins. Underwriters, Inc. (N.D.Cal. 2007) 504 F.Supp.2d 803 (Storek), Travelers claims that extrinsic evidence that Five Star remediated dry rot at Sunflorin in 2000 did not give rise to a duty to defend because "a proponent of coverage may not speculate about unpled claims that a third party might have asserted in order to manufacture insurance coverage." We do not agree. Storek involved a dispute among three brothers about the management of a commonly owned building. Two of the brothers, Richard and Craig (the plaintiffs), filed a lawsuit accusing the third brother, Glenn, of improperly using building funds for personal gain. (Id. at p. 806.) Glenn cross-claimed, asserting 12 causes of action pertaining to the building's financial management. (Id. at pp. 806-807.) The plaintiffs tendered the cross-complaint to their insurer, asserting that they were entitled to a defense under the terms of a policy obligating the insurer to pay "`those sums that the insured becomes legally obligated to pay as damages because of bodily injury, property damage, personal injury or advertising injury.'" The insurer declined to defend. (Id. at p. 807.)
The plaintiffs sued the insurer for breach of contract. In opposition to the insurer's motion for summary judgment, the plaintiffs pointed to extrinsic evidencespecifically (1) e-mails in which Glenn asserted that the plaintiffs' allegations of mismanagement were "`not truthful,'" and (2) a letter from Glenn accusing the plaintiffs of wrongfully excluding him from the property. This extrinsic evidence, the plaintiffs said, gave rise to a potential for liability based on covered (but unpled) claims for slander, defamation, or libel. (Storek, supra, 504 F.Supp.2d at pp. 809-810.)
The district court disagreed, holding that the cross-complaint did not give rise to a duty to defend as a matter of law. While it acknowledged the breadth of the duty to defend under California law, it held that the duty is "not so expansive that it requires an insurer to undertake a defense as to claims that are both factually and legally untethered from the third party's complaint." (Storek, supra, 504 F.Supp.2d at p. 812.) In other words, the court said, there is no duty to defend "when the underlying lawsuit sets forth neither the facts nor the legal claims necessary to bring the lawsuit within the terms of the policy." (Ibid., italics added.) The insurer thus owed no duty to defend because Glenn did not "include any allegations about his brothers' `untrue statements' or his exclusion from the Storek Building in his cross-complaint, and he also elected not to advance any claims for wrongful eviction, *1468 defamation, slander, or libel." (Id. at p. 811.) As a result, "[h]is complaint thus contains neither the legal claims that would give rise to coverage under the Policy, nor any of the factual allegations that would be necessary to support such claims." (Ibid.)
The present case differs materially from Storek. Unlike Storek, where there was no duty to defend because the extrinsic facts on which the insureds premised their claim of duty were untethered to the legal claims made in the underlying complaint, here, the extrinsic facts on which Arrowood relies are directly tethered to the legal claims made in the underlying case. Specifically, the extrinsic evidence on which Arrowood relies (i.e., evidence that Five Star did dry rot repair at Sunflorin in 2000) would tend to support a claim for negligence based on a failure to detect and repair dry rot. That is precisely the claim made against Five Star in the underlying case. Thus, even if Storek were binding on us, it would not inform our analysis of the duty to defend in the present case.[6]
Travelers also relies on Buena Vista Mines, Inc. v. Industrial Indemnity Co., supra, 87 Cal.App.4th 482 (Buena Vista Mines) for the proposition that there can be no duty to defend when the underlying complaint expressly alleges that the tortious conduct that forms the basis of the complaint occurred after the relevant policy period. The underlying action in Buena Vista Mines alleged that the insured had violated the Clean Water Act by improperly discharging pollutants into Santa Rosa Creek. (87 Cal.App.4th at p. 485.) To avoid running afoul of the Clean Water Act's five-year statute of limitations, the complaint expressly limited its claims to "`the period June 11, 1992 to date.'" (87 Cal.App.4th at p. 485, italics omitted.) Notwithstanding this limitation, the insured tendered the claim to insurers who had issued CGL policies prior to 1992. (Id. at pp. 485-486.) The court held that the insurers had no duty to defend as a matter of law because the underlying complaint "expressly identifie[d] the dates of the alleged violations as occurring on or after June 11, 1992." (Id. at p. 488.) Further, the court said, it "made no sense" to read the complaint to allege unpled claims that were "obviously barred by the statute of limitations." (Id. at pp. 488-489.) Thus, "[n]othing in the complaint in the [underlying] action or appellants' amended complaint shows that appellants were sued for discharges occurring during respondents' policy periods, thereby giving rise to a duty to defend ...." (Id. at p. 489.)
*1469 We do not agree with Travelers that Buena Vista Mines compels the conclusion that, as a matter of law, there was no duty to defend in the present case. In Buena Vista Mines, the plaintiffs in the underlying case precisely defined the dates of the alleged tortious conduct to avoid the statute of limitations. Thus, there existed no reasonable possibility that the underlying complaint would be amended to state a claim covered by the insurers' CGL policies. The present case is very different. Here, plaintiffs in the underlying case did not precisely allege when the asserted misconduct took place instead, they asserted that it occurred "on or about November 2002." (Italics added.) Further, there is no indication that plaintiffs deliberately crafted the allegation to avoid an affirmative defense. Thus, there is no reason to believe that plaintiffs would not have expanded the scope of the allegation against Five Star if they determined during discovery that Five Star had done dry rot remediation prior to 2002.
For all of these reasons, we conclude that Travelers owed Five Star a duty to defend.

II. Travelers Owed Five Star a Duty to Make Supplementary Payments

The Travelers policy provided for reimbursement of "supplementary payments" as follows: "We will pay with respect to any claim we investigate or settle, or any `suit' against an insured we defend: [¶] ... [¶]
"5. All costs taxed against the insured in the `suit.'
"6. Prejudgment interest awarded against the insured on that part of the judgment we pay....
"7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance."
(3) This supplementary payment provision has been interpreted to "make the insurer's obligation to pay an award of costs against the insured dependent on the defense duty," not on the indemnification duty. (State Farm General Ins. Co. v. Mintarsih (2009) 175 Cal.App.4th 274, 284 [95 Cal.Rptr.3d 845], italics added; see also Prichard v. Liberty Mutual Ins. Co. (2000) 84 Cal.App.4th 890, 912 [101 Cal.Rptr.2d 298].) It further has been interpreted to mean that the insurer has a duty to make supplemental payments if it had a duty to defend, regardless of whether the insurer actually provided a defense. (State Farm General Ins. Co. v. Mintarsih, supra, at p. 284; Golden Eagle Ins. Corp. v. Cen-Fed, Ltd. (2007) 148 Cal.App.4th 976, 991-996 [56 Cal.Rptr.3d 279].) And, courts have interpreted the word "costs" *1470 as used in the supplementary payments provision "consistent with its use in Code of Civil Procedure section 1033.5, subdivision (a)(10), which provides that attorney fees authorized by contract, statute, or law are allowable as costs to the prevailing party under Code of Civil Procedure section 1032." (State Farm General Ins. Co. v. Mintarsih, supra, at p. 284; see Prichard v. Liberty Mutual Ins. Co., supra, at p. 912.)
Travelers concedes that California courts "generally recognize that an insurer's obligation to fund supplementary payments is included within an insurer's defense obligation," but it contends that it did not owe supplementary payments because it had no duty to defend Five Star. As we have already rejected this contentionand as Travelers makes no alternative argumentwe conclude that Travelers owed Five Star supplementary payments.

III. Travelers Owed Five Star a Duty of Indemnity

(4) "`Indemnity may be defined as the obligation resting on one party to make good a loss or damage another party has incurred. (Sammer v. Ball (1970) 12 Cal.App.3d 607, 610 [91 Cal.Rptr. 121].) This obligation may be expressly provided for by contract (e.g., Markley v. Beagle (1967) 66 Cal.2d 951, 961 [59 Cal.Rptr. 809, 429 P.2d 129]), it may be implied from a contract not specifically mentioning indemnity (see Cahill Bros., Inc. v. Clementina Co. (1962) 208 Cal.App.2d 367, 375-379 [25 Cal.Rptr. 301]), or it may arise from the equities of particular circumstances (S.F. Examiner Division v. Sweat (1967) 248 Cal.App.2d 493, 497 [56 Cal.Rptr. 711]; see Note, Contribution and Indemnity in California (1969) 57 Cal. L.Rev. 490, 492-493). Where, as here, the parties have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract .... (Markley v. Beagle, supra, at p. 961.)' (Rossmoor Sanitation, Inc. v. Pylon, Inc. (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97] ....)" (McCrary Construction Co. v. Metal Deck Specialists, Inc. (2005) 133 Cal.App.4th 1528, 1536 [35 Cal.Rptr.3d 624].)
The Travelers policy provided that it would "pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies." It further provided that covered bodily injury and property damage were limited to that occurring "during the policy period."
There is no dispute that the negligent conduct for which Five Star was found liable caused "property damage" within the meaning of the Travelers policy. Travelers contends, however, that Five Star did not become "legally obligated" to pay damages because of property damage that occurred during Travelers's policy period. In other words, Travelers contends that because the *1471 claim against Five Star was based solely on the work it did in 2002, the damages assessed against it necessarily were based on property damage plaintiffs suffered in 2002 and thereafter. Arrowood disagrees, contending that the jury assessed damages against Five Star for negligence in 2000, as well as in 2002. To resolve this issue, we consider the jury's special findings and the evidence and instructions on which they were based.

A. The Jury's Verdict Is Ambiguous

As relevant here, the special verdict form stated as follows:
"Question 1:
"Did George Dunmore and/or FPI Management, Inc. contract with Five Star Services to identify and remediate all known and unknown actual and appreciable dry rot on the property as part of the work Five Star Services engaged in late 2002 and 2003?
"Yes."
"Question 2:
"Did Five Star Services remediate all of the actual and appreciable dry rot it contracted to remediate on the property as part of the work in late 2002 and 2003?
"... No."
"Question 3:
"Did FPI Management, Inc. and/or George Dunmore discover or ought to have discovered prior to the sale of the property to Ron and Maureen Ashley on March 18, 2004, that Five Star Services failed to repair the actual and appreciable dry rot it contracted to repair?
"... No."
"Question 4:
"Was Five Star Services negligent by failing to perform dry rot repairs in a competent and reasonable manner?
"Yes."
*1472 "Question 5:
"Was Five Star Services' negligence a substantial factor in causing harm to Ron and Maureen Ashley?
"Yes."
"Question 6:
"Was FPI Management, Inc. negligent in failing to supervise Five Star Services' repairs at the property in a reasonable and competent manner?
"... No."
"Question 9:
"What are Ron and Maureen Ashley's total damages for the reasonable costs to repair property damage caused by any of the defendants? Do not reduce the damages based on the fault, if any, of Ron and Maureen Ashley or others.
"Total: $717,358.80."
"Question 10:
"Were Ron and Maureen Ashley negligent?
"Yes."
"Question 11:
"Was Ron and Maureen Ashley's negligence a substantial factor in causing their harm?
"Yes."
"Question 12:
"What percentage of fault do you assign to each party? ...
"Five Star Services: 50% [¶] ... [¶]
"Ron and Maureen Ashley: 50%
*1473 "Total: 100%"
Because of the rather peculiar wording of the special verdict form, the scope of what the jury decided is not entirely clear. That is, while the first two questions directed the jury to determine whether Five Star had performed all that it contracted to do in 2002 and 2003, the questions that followed concerning Five Star's alleged negligence (questions 4-12) were not similarly limited by date. Moreover, nothing in the phrasing of the special verdict form suggested to the jury that it was to consider the latter questions in light of the earlier ones. We therefore look at the complaint, evidence, and jury instructions to attempt to discern what the jury decided.
As we have said, the complaints in the underlying case alleged that Five Star performed dry rot remediation "[i]n or about November of 2002." These complaints were never amended to broaden the allegations against Five Star. Nonetheless, at trial there was testimony about Five Star's work at Sunflorin in both 2002 and 2000. This evidence included the following.
Carrie Briggs, an FPI property manager, testified that sometime in 2000, she realized that dry rot repairs were needed at the property and she solicited bids for the work. Five Star agreed to perform the repairs described in the initial contract for $20,000. Later, in October 2000, Five Star advised Briggs it had discovered additional dry rot, which it charged $6,200 to repair. David Gutierrez, Five Star's manager, also testified about Five Star's work in 2000; Gutierrez said that he initially bid on a scope of work provided to him by FPI, but submitted change orders as he found additional dry rot around the complex.
Wayne Wilcox, a forest products pathologist retained by plaintiffs, testified that in Northern California, it takes four to six years for a building with severe moisture problems to develop an advanced state of decay such as he saw at the Sunflorin building. He told the jury that based on his observations, he believed that water intrusion and decay probably had begun with the first rains after the building's construction in 1977, "reaching an advanced stage of decay at least four to six years after that." The decay would not have been visible during a walk-through of the property, but "would have been visible as [Five Star] opened areas up, as conveyed in the change orders."
John Donley, a damages expert retained by the Ashleys, testified that the Ashleys spent $776,000 to correct the repairs performed by Five Stari.e., to "correct[] ... dry-rot in patio and balcony walls that Five Star attempted to do but failed to perform correctly." Donley said that in order to eliminate dry rot, the Ashleys' contractor, JAD, did extensive work through the Sunflorin complex, ultimately repairing patio and balcony walls in 174 units, 155 of *1474 which had previously been worked on by Five Star. Donley believed that the dry rot repaired by JAD "in large part relate[d] to dry-rot that ha[d] been in existence at [Sunflorin] for many years," probably since the complex was built. Accordingly, he agreed that "there was certainly an abundance of dry-rot on the Sunflorin complex when Five Star first came there to perform its work."
None of the instructions directed the jury to limit its consideration of Five Star's alleged negligence and the Ashleys' resulting damages to those repairs performed by Five Star in 2002. Indeed, none of the instructions were limited by date in any fashion. Instead, the jury was told that to establish their claim against Five Star, the Ashleys had to prove (1) "Five Star Services had a legal duty to conform to a standard of conduct to protect Plaintiffs"; (2) "Five Star Services failed to meet this standard of conduct"; (3) "Five Star Services['s] negligence was a substantial factor in causing the plaintiffs' harm"; and (4) "[t]he Ashleys were harmed." With respect to duty, the court told the jury that "the Ashleys claim that they were harmed by Five Star's negligent performance of its contracts to repair dry rot at the Sunflorin property." (Italics added.) And, the jury was told that if it decided that the Ashleys proved their claim, it must award damages "for each item of harm that was caused by each defendant's wrongful conduct."
Because the jury heard extensive evidence of alleged negligent repairs in 2002 and in 2000, and because the instructions did not direct the jury to consider the 2000 evidence for a limited purpose only, we cannot conclude, as Travelers urges, that "both the pleadings and the Special Verdict show that the action against Five Star related solely to the work it performed in connection with the November 2002 Remediation Agreement." Indeed, we believe the special findings are equally susceptible to the interpretation that the judgment was based on the remediation work Five Star did in both 2000 and 2002. We turn therefore to an issue of first impression: Which party bears the burden of proof under the circumstances of this case?

B. Travelers Bears the Ultimate Burden of Proof in the Circumstances of the Present Case

To our knowledge, no California court has considered the relative burdens of proof in a contribution action between insurers when the underlying case has gone to trial and been resolved by a jury.[7] Another division of this district has considered the issue in a related context, however, when the underlying action was resolved by settlement. We therefore begin with that court's analysis.
*1475 In Safeco Ins. Co. of America v. Superior Court (2006) 140 Cal.App.4th 874 [44 Cal.Rptr.3d 841] (Safeco), 13 construction companies purchased CGL policies from one of two insurance companies (collectively, Safeco), and then later purchased additional CGL policies from Century Surety Company (Century). All of the policies provided coverage for property damage that occurred within the policy period and arose from the contractors' work. (Id. at p. 877.) In separate lawsuits, the 13 insureds were sued for property damage allegedly arising from their work during the periods covered by the Safeco and Century policies. In each case the insured tendered its defense to Safeco and Century; in each case, Safeco provided a defense under a reservation of rights and provided indemnity in the cases that settled, but Century rejected all tenders and refused to participate. (Ibid.)
Following the settlements, Safeco sued Century for equitable contribution and declaratory relief, alleging that Century had breached its duty to defend the carriers' mutual insureds, thus obligating Century to reimburse Safeco for its equitable share of the costs of defense and underlying actions. (Safeco, supra, 140 Cal.App.4th at p. 877.) Safeco moved for summary judgment; the trial court denied the motion, explaining that because the underlying complaints were "`very general,'" there was "`an issue as to whether the alleged damages took place during a period of time when Century's policies were in effect. Without the possibility of coverage there is no duty to defend. Even if there was a showing of possible coverage so that there was a duty to defend, [Safeco] would not be entitled to contribution until [it] established as a matter of law that there was coverage. [Citation.] This they have not done.'" (Id. at p. 878, italics omitted.)
Safeco filed a petition for writ of mandate challenging the trial court's ruling. In the writ proceeding, the insurers agreed that a settling insurer seeking equitable contribution from a nonparticipating coinsurer need only establish a potential for coverage under the recalcitrant coinsurer's policy in order to obtain contribution for the costs of defense. They disagreed, however, about the showing necessary to obtain contribution for a settlement: Safeco contended that it need show only a possibility of coverage, while Century urged that actual coverage must be shown. (Safeco, supra, 140 Cal.App.4th at p. 879.)
For "equitable and public policy reasons," the appellate court held that once Safeco had made a prima facie showing of coverage (i.e., of potential liability triggering a duty to defend), it had met its burden of proof. The alleged absence of actual coverage under Century's policy was a defense that Century then was required to raise and prove. (Safeco, supra, 140 Cal.App.4th at p. 879.) The court explained: "Because the issue before us falls squarely within the rule permitting a nonparticipating insurer to raise coverage issues *1476 as affirmative defenses in an action in which the settling insurers seek equitable contribution [citations], we decline Century's invitation to diverge from this standard by adopting a rule that would encourage insurance companies to disavow their contractual responsibilities to their insureds [citation] and, by extension, their responsibilities to coinsurers. Instead, we hold that in an action for equitable contribution by a settling insurer against a nonparticipating insurer, the settling insurer has met its burden of proof when it makes a prima facie showing of coverage under the nonparticipating insurer's policythe same showing necessary to trigger the recalcitrant insurer's duty to defendand that the burden of proof then shifts to the nonparticipating insurer to prove the absence of actual coverage. [Citation.]" (Id. at p. 881; see also Atlantic Mutual Ins. Co. v. J. Lamb, Inc. (2002) 100 Cal.App.4th 1017, 1043-1046 [123 Cal.Rptr.2d 256] [insurer who refused to defend or indemnify would have the burden of proof in equitable subrogation action between insurers who issued liability policies to common insured in subsequent years].)
As distinct from Safeco, the underlying claims in the present case were resolved by a trial, not by settlement. The present case is like Safeco, however, because in each case the dates of the conduct on which the insured's liability was premised could not be conclusively determinedthere, because of the generality of the complaint; here, because of the ambiguity of the special verdict form.
(5) We adopt Safeco's analysis in the present context because while the facts here are somewhat different, the policy considerations are not. As Safeco noted, contribution is an equitable rule intended "`"to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others."'" (Safeco, supra, 140 Cal.App.4th at p. 879, quoting Maryland Casualty Co. v. Nationwide Mutual Ins. Co. (2000) 81 Cal.App.4th 1082, 1089 [97 Cal.Rptr.2d 374].) Applying the Safeco burden-shifting rule here tends to spread risk among insurers and prevent one insurer from profiting at another's expense. Additionally, applying Safeco's shifting of burdens here discourages insurers from attempting to avoid their responsibilities to their insureds and, by extension, to their coinsurers.
(6) For all of these reasons, we conclude that in an action for equitable contribution brought by an insurer who has defended and indemnified an insured against a coinsurer who has not defended or has not indemnified the insured, the participating insurer has met its burden of proof when it makes a prima facie showing of coverage under the nonparticipating insurer's policythe same showing necessary to trigger the recalcitrant insurer's duty to defend. The burden of proof then shifts to the nonparticipating insurer to prove the absence of actual coverage.

*1477 C. Travelers Has Failed to Meet Its Burden of Proof

Applying the foregoing, we conclude that Arrowood has satisfied its burden of proof. As indicated, Arrowood had the burden of making a prima facie showing of coverage under the Travelers policy. For all the reasons discussed in part I., ante, Arrowood made this showing. The burden of proof thus shifted to Travelers to prove the absence of actual coverage.
Based on the entire record before us, we cannot conclude that Travelers proved the absence of coverage. As we have said, at trial in the underlying action, a great deal of evidence was introduced concerning Five Star's alleged negligence in 2000. The jury was not instructed that it should not consider this evidence when evaluating Five Star's negligenceto the contrary, the court instructed it that "the Ashleys claim that they were harmed by Five Star's negligent performance of its contracts to repair dry rot at the Sunflorin property" and that it must award the plaintiffs damages "for each item of harm that was caused by each defendant's wrongful conduct." (Italics added.) Further, nothing in the special verdict form directed the jury to limit its consideration of negligence to Five Star's work in 2002 and 2003; as we have said, while the first two questions directed the jury to determine whether Five Star performed all that it contracted to do in 2002 and 2003, the questions that followed concerning Five Star's alleged negligence (questions 4-12) were not similarly limited by date, and nothing in the phrasing of the special verdict form suggested that the jury was to consider the latter questions in light of the earlier ones. Accordingly, we cannot conclude that it is more likely than not that the jury based its negligence finding exclusively on work performed in 2002 and 2003. We find as a matter of law that Travelers has not met its burden of proof and, thus, that Travelers owed Five Star a duty to indemnify under its CGL policy.

IV. Arrowood's Equitable Contribution Claim Must Be Remanded to the Trial Court

(7) The insurers' obligations to one another are based on principles of equitable contribution. "In the context of insurance law, the doctrine of equitable contribution may be simply stated. `[W]here two or more insurers independently provide primary insurance on the same risk for which they are both liable for any loss to the same insured, the insurance carrier who pays the loss or defends a lawsuit against the insured is entitled to equitable contribution from the other insurer or insurers ... [.]' (Fireman's Fund Ins. Co. v. Maryland Casualty Co. (1998) 65 Cal.App.4th 1279, 1289 [77 Cal.Rptr.2d 296].)" (American Continental Ins. Co. v. American Casualty Co. (2001) 86 Cal.App.4th 929, 936-937 [103 Cal.Rptr.2d 632].)
*1478 Equitable contribution "is predicated on the commonsense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor." (Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra, 65 Cal.App.4th at p. 1295.)
(8) "The right to contribution depends upon the existence of an obligation owed to a common insured. The right arises when one of two or more insurers is `obligated to indemnify or defend' the same loss or claim and one of those insurers has paid more than its share of the loss or defended the action without participation from the others. (Fireman's Fund Ins. Co. v. Maryland Casualty Co., supra, 65 Cal.App.4th at p. 1293.) `Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was equally and concurrently owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others. [Citations] [Fn. omitted.]'" (American Continental Ins. Co. v. American Casualty Co., supra, 86 Cal.App.4th at p. 937.)
(9) Our determination that Travelers owed Five Star duties of defense and indemnity compels the conclusion that Arrowood is entitled to equitable contribution from Travelers. It does not, however, direct how the indemnity and defense costs should be apportioned between the two insurers. That determination must be made by the trial court, not this court. "In choosing the appropriate method of allocating defense costs among multiple liability insurance carriers, each insuring the same insured, a trial court must determine which method of allocation will most equitably distribute the obligation among the insurers `pro rata in proportion to their respective coverage of the risk,' as `a matter of distributive justice and equity.' (Fireman's Fund, supra, 65 Cal.App.4th at pp. 1293, 1308.) As such, the trial court's determination of which method of allocation will produce the most equitable results is necessarily a matter of its equitable judicial discretion. [Citations.]" (Centennial Ins. Co. v. United States Fire Ins. Co. (2001) 88 Cal.App.4th 105, 111 [105 Cal.Rptr.2d 559], italics added.) We thus return this matter to the trial court to permit it to exercise its discretion in determining how most equitably to allocate defense and indemnity costs between the insurers.

*1479 DISPOSITION
We reverse the judgment of the trial court and remand this matter for further proceedings consistent with this opinion. Arrowood shall recover its costs on appeal.
Willhite, Acting P. J., and Manella, J., concurred.
NOTES
[1] According to the parties, Five Star also purchased a CGL policy from North American Capacity Insurance Company, which was in effect from July 1, 2001, to July 1, 2002. However, neither Five Star nor Arrowood tendered the underlying litigation to North American.
[2] Arrowood and Travelers stipulated in the trial court that Travelers also issued checks in the amounts of $13,153 and $10 in payment of a portion of Five Star's liability. Travelers contends that these sums were portions of the costs awards against Five Star; Arrowood appears to challenge this contention.
[3] Among other things, Travelers and Arrowood stipulated that Five Star performed dry rot remediation work at the property pursuant to the following "Proposals/Contracts":

 6/28/00, signed 8/2/00 $20,000
 10/3/00 $6,200
 11/8/02 $44,927
 12/2/02 $2,462
 12/16/02 $4,163
 12/30/02 $3,153
 1/07/03 $2,500
 1/08/03 $2,500
 1/14/03 $11,261
 1/27/03 $5,020
 Total $102,186

[4] Travelers contends that because Arrowood elected not to request a statement of decision, under the "doctrine of implied findings," this court must presume that the trial court made all factual findings necessary to support the judgment and the only issue on appeal is whether the implied findings are supported by substantial evidence. We do not agree. Because the parties stipulated to most of the relevant facts, the trial court resolved only legal issues. As such, a statement of decision was not required. (See Eder v. Department of Fish & Game (2009) 170 Cal.App.4th 216, 224, fn. 11 [87 Cal.Rptr.3d 788].)
[5] Because we have concluded that Travelers had a duty to defend as a matter of law, we need not reach Arrowood's alternative contention that Travelers has made binding admissions of a duty to defend in this action.
[6] Federal decisions on matters of California law "`[are not] binding or conclusive on the courts of this state.' (Bank of Italy etc. Assn. v. Bentley (1933) 217 Cal. 644, 653 [20 P.2d 940].)" (Miller v. Collectors Universe, Inc. (2008) 159 Cal.App.4th 988, 1001, fn. 10 [72 Cal.Rptr.3d 194]; see also JPI Westcoast Construction, L.P. v. RJS & Associates, Inc. (2007) 156 Cal.App.4th 1448, 1465, fn. 2 [68 Cal.Rptr.3d 91] ["`"federal decisional authority is neither binding nor controlling in matters involving state law"'"].)
[7] We suspect that the reason for the lack of guidance on this issue is a simple one: In a typical case, after an underlying dispute has been resolved by a trier of fact, there simply is no dispute about the contours of what the trier of fact decided.